**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| C4CAST.COM, INC. | § | |
| | § | |
| v. | § | Case No. 2:12-CV-271-JRG-RSP |
| | § | CONSOLIDATED |
| | § | |
| DELL, INC. | § | |

**CLAIM CONSTRUCTION**
**MEMORANDUM AND ORDER**

On June 27, 2013, the Court held a hearing to determine the proper construction of the

disputed claim terms in United States Patent No. 7,958,204.  After considering the arguments

made by the parties at the hearing and in the parties' claim construction briefing, the Court issues

this Claim Construction Memorandum and Order.

# TABLE OF CONTENTS

**BACKGROUND** ............................................................................................................ **3**

**APPLICABLE LAW** ..................................................................................................... **3**

**PERSON OF ORDINARY SKILL IN THE ART** .................................................... **7**

**CONSTRUCTION OF AGREED TERMS** ............................................................... **8**

**CONSTRUCTION OF DISPUTED TERMS** ............................................................ **8**

    A. "modifying the collection based on the points" (Claim 1) ................................... 9

    B. "based on an amount of participant access of said individual resources" (Claim 1) .......... 15

    C. "can be accessed by a participant over the electronic network" (Claims 1 and 20) ........... 20

    D. "individual resources are accessed via the collection" (Claim 9) ...................................... 20

    E. "maintaining" (Claim 1) ..................................................................................... 22

    F. "means for modifying the collection based on the points assigned to the resources" (Claim 20) ................................................................................................................ 25

    G. "means for maintaining a collection of resources" (Claim 20) ........................................... 35

    H. "means for assigning points to individual resources based on an amount of participant access of said individual resources over the electronic network" (Claim 20) ......................... 42

**CONCLUSION** .......................................................................................................... **47**

**BACKGROUND**

Plaintiff asserts United States Patent No. 7,958,204 ("the '204 Patent"), titled "Community-Selected Content." The '204 Patent issued on June 7, 2011, and bears a priority date of September 8, 1999. The remaining Defendants in the above-captioned consolidated case are Dell, Inc., Blockbuster, LLC, and Dish Network Corporation (collectively, "Defendants").

In general, the '204 Patent relates to enabling a community of participants to access resources in a collection and to automatically modify the collection based at least in part on participant access. The Abstract of the '204 Patent states:

> Provided are, among other things, systems, methods and techniques for providing resources to participants over an electronic network. In one representative embodiment, a collection of resources is maintained, such that both the collection and the resources can be accessed by a participant over the electronic network at any given time; points are assigned to individual resources based on an amount of participant access of the individual resources over the electronic network; and the collection is modified based on the points assigned to the resources.

At the time of the parties' claim construction briefing, Plaintiff also asserted United States Patent No. 6,658,467 ("the '467 Patent"). At the June 27, 2013 hearing, the parties confirmed that Plaintiff no longer asserts the '467 Patent in the above-captioned case. The terms that were briefed by the parties as disputed terms but that are no longer at issue in the above-captioned case are: "assigned in a predetermined manner"; "based upon a participation level of said participant"; and "plural different activity indicators." The Court accordingly does not address those terms in the analysis below.

**APPLICABLE LAW**

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys.*,

*Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  To determine the meaning of the claims, courts start

by considering the intrinsic evidence.  *See id.* at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*,

388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group,*

*Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001).  The intrinsic evidence includes the claims

themselves, the specification, and the prosecution history.  *See Phillips*, 415 F.3d at 1314; *C.R.*

*Bard*, 388 F.3d at 861.  Courts give claim terms their ordinary and accustomed meaning as

understood by one of ordinary skill in the art at the time of the invention in the context of the

entire patent.  *Phillips*, 415 F.3d at 1312-13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361,

1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of

particular claim terms.  *Phillips*, 415 F.3d at 1314.  First, a term's context in the asserted claim

can be very instructive.  *Id.*  Other asserted or unasserted claims can aid in determining the

claim's meaning because claim terms are typically used consistently throughout the patent.  *Id.*

Differences among the claim terms can also assist in understanding a term's meaning.  *Id.*  For

example, when a dependent claim adds a limitation to an independent claim, it is presumed that

the independent claim does not include the limitation.  *Id.* at 1314-15.

"[C]laims 'must be read in view of the specification, of which they are a part.'"  *Id.*

(quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)).

"[T]he specification 'is always highly relevant to the claim construction analysis.  Usually, it is

dispositive; it is the single best guide to the meaning of a disputed term.'"  *Id.* (quoting *Vitronics*

*Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am.*

*Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).  This is true because a patentee may define his own

terms, give a claim term a different meaning than the term would otherwise possess, or disclaim

or disavow the claim scope.  *Phillips*, 415 F.3d at 1316.  In these situations, the inventor's

lexicography governs.  *Id.*  The specification may also resolve the meaning of ambiguous claim

terms "where the ordinary and accustomed meaning of the words used in the claims lack

sufficient clarity to permit the scope of the claim to be ascertained from the words alone."

*Teleflex*, 299 F.3d at 1325.  But, "[a]lthough the specification may aid the court in interpreting

the meaning of disputed claim language, particular embodiments and examples appearing in the

specification will not generally be read into the claims."  *Comark Commc'ns, Inc. v. Harris*

*Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*,

848 F.2d 1560, 1571 (Fed. Cir. 1988)); *accord Phillips*, 415 F.3d at 1323.  The prosecution

history is another tool to supply the proper context for claim construction because a patent

applicant may also define a term in prosecuting the patent.  *Home Diagnostics, Inc., v. Lifescan,*

*Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent

applicant may define a term in prosecuting a patent.").

        Although extrinsic evidence can be useful, it is "less significant than the intrinsic record

in determining the legally operative meaning of claim language."  *Phillips*, 415 F.3d at 1317

(quoting *C.R. Bard*, 388 F.3d at 862).  Technical dictionaries and treatises may help a court

understand the underlying technology and the manner in which one skilled in the art might use

claim terms, but technical dictionaries and treatises may provide definitions that are too broad or

may not be indicative of how the term is used in the patent.  *Id.* at 1318.  Similarly, expert

testimony may aid a court in understanding the underlying technology and determining the

particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported

assertions as to a term's definition are entirely unhelpful to a court.  *Id.*  Generally, extrinsic

evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*

Indefiniteness is a "legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims." *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1376 (Fed. Cir. 2001) (citation omitted). A finding of indefiniteness must overcome the statutory presumption of validity. *See* 35 U.S.C. § 282. That is, the "standard [for finding indefiniteness] is met where an accused infringer shows by clear and convincing evidence that a skilled artisan could not discern the boundaries of the claim based on the claim language, the specification, and the prosecution history, as well as her knowledge of the relevant art area." *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249-50 (Fed. Cir. 2008).

> In determining whether that standard is met, i.e., whether the claims at issue are sufficiently precise to permit a potential competitor to determine whether or not he is infringing, we have not held that a claim is indefinite merely because it poses a difficult issue of claim construction. We engage in claim construction every day, and cases frequently present close questions of claim construction on which expert witnesses, trial courts, and even the judges of this court may disagree. Under a broad concept of indefiniteness, all but the clearest claim construction issues could be regarded as giving rise to invalidating indefiniteness in the claims at issue. But we have not adopted that approach to the law of indefiniteness. We have not insisted that claims be plain on their face in order to avoid condemnation for indefiniteness; rather, what we have asked is that the claims be amenable to construction, however difficult that task may be. If a claim is insolubly ambiguous, and no narrowing construction can properly be adopted, we have held the claim indefinite. If the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds. . . . By finding claims indefinite only if reasonable efforts at claim construction prove futile, we accord respect to the statutory presumption of patent validity . . . and we protect the inventive contribution of patentees, even when the drafting of their patents has been less than ideal.

*Exxon*, 265 F.3d at 1375 (citations and internal quotation marks omitted).

## PERSON OF ORDINARY SKILL IN THE ART

The parties dispute the level of skill of a person of ordinary skill in the art.  The Court has

a duty to resolve this dispute.  *See Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1478 (Fed.

Cir. 1998) (noting that "claim construction requires . . . assessment of the level of ordinary skill

in the art").

Plaintiff argues that "a person having ordinary skill interpreting the claims of the

Patent[]-in-Suit would have a bachelor's degree in science and completed an intermediate-level

course in the field of statistics or have equivalent experience and/or training in the collection,

organization, analysis, interpretation and presentation of data." Dkt. No. 113 at 4-5.  Plaintiff

notes that "[t]he Background of the Invention and Description of the Prior Art sections of the

Patent[]-in-Suit refer to statistical modeling as an important aspect of the invention.  Also, the

inventors of the Patent[]-in-Suit have all completed at least an intermediate-level course related

to statistics." *Id.* at 4.

Defendants respond that "a person of ordinary skill in the art at the time of invention for

the Patent[]-in-Suit would have at least a bachelor's degree in computer science, or equivalent,

with one or more years of experience in both programming and website creation." Dkt. No. 116

at 27.  Defendants argue that because the claims at issue relate to software and websites rather

than to statistics or general science, the relevant person of ordinary skill "would have some

formal education and/or experience with programming" and with "creating websites." *Id.*

On balance, Defendants are correct that the claims of the patent-in-suit pertain more to

computer science and website development than to statistics.  The Court therefore hereby

substantially adopts Defendants' proposal and finds that the level of ordinary skill is "at least a

bachelor's degree in computer science, or equivalent, and at least one year of experience in both programming and website creation, or equivalent."

## CONSTRUCTION OF AGREED TERMS

| Term | Construction |
|---|---|
| "resources"<br><br>(Claims 1, 9, 10, 13, and 20) | "website contents available to a user" |
| "a collection of resources"<br><br>(Claims 1, 9, 10, 13, and 20) | "a group of resources" |
| "points"<br><br>(Claims 1, 3, 9, 11, 13, and 20) | "a numerical value" |
| "assigned to said individual resources based on how the participants rated said individual resources"<br><br>(Claim 11) | "assigning a numerical value to a resource based on how a user rated the resource" |

Dkt. No. 128, Ex. A, 6/19/2013 Amended Joint Claim Construction Chart ("JCCC") at 1.

## CONSTRUCTION OF DISPUTED TERMS

The Court addresses the disputed terms in the order those terms are presented in the parties' June 19, 2013 Amended Joint Claim Construction Chart.  Dkt. No. 128, Ex. A at 2-5. Also, although some claims may be asserted against less than all of the Defendants, for convenience the following discussion will refer to the proposals and arguments of "Defendants."

Shortly before the start of the June 27, 2013 hearing, the Court provided the parties with preliminary constructions of the disputed terms with the aim of focusing the parties' arguments and facilitating discussion.  These preliminary constructions are set forth within the discussion of each term, below.

### A.  "modifying the collection based on the points" (Claim 1)

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "making changes to the collection of resources based on the points associated with that resource" | "adding or removing a resource to/from the collection based on the points for that resource" |

JCCC at 2.  The Court provided the parties with the following preliminary construction: "adding a resource to the collection, or removing a resource from the collection, based on the points for that resource."

    (1)  The Parties' Positions

    Plaintiff argues claim differentiation as to dependent claims reciting that resources are "removed from the collection."  Dkt. No. 113 at 13-14.  Plaintiff also cites passages in the specification and the prosecution history, as well as extrinsic dictionary definitions, that purportedly use "modifying" broadly.  *Id.* at 14-15.

    Defendants respond that "[Plaintiff's] construction of 'making changes' is overly-broad inasmuch as it would allow nearly any change to the collection of resources to qualify as 'modifying,' contrary to the patentee's representations to the PTO."  Dkt. No. 116 at 2; *see id.* at 3 (citing *Saffran v. Johnson & Johnson*, 712 F.3d 549, 559 (Fed. Cir. 2013) ("[A] prosecution disclaimer requires 'clear and unambiguous disavowal of claim scope,' but applicants rarely submit affirmative disclaimers along the lines of 'I hereby disclaim the following . . .' during prosecution and need not do so to meet the applicable standard.") (internal citations omitted)).  Defendants submit that "according to the patentees, the mere rearrangement (or re-ordering) of search results cannot qualify as 'modifying' the collection."  *Id.* at 3.  As to Plaintiff's dictionary definitions, Defendants respond that "the Federal Circuit has cautioned against using them to expand the scope of patent claims."  *Id.* (citing *Phillips*, 415 F.3d at 1322).

Plaintiff replies that in the prosecution history cited by Defendants, the prior art reference disclosed *ordering* of search results depending on *factors other than access*, such as the frequency or location of keywords, which the patentee explained is different from *modifying* a collection based on an *amount of participant access.* Dkt. No. 118 at 3. Plaintiff reiterates that "[Plaintiff's] argument, simply stated, is that modifying, in light of both the specification and the prosecution history, is clearly more than 'adding or removing.'" *Id.* at 3-4.

At the June 27, 2013 hearing, Plaintiff reiterated that re-ordering and organizing should be included within the scope of "modifying." Plaintiff cited disclosure in the specification regarding updating, ranking, and ordering. *See* '204 Patent at 10:25-35, 37:66-67 & 40:57-58. Defendants responded that in the specification, "modifying" is always discussed as either adding or removing. Defendants also re-emphasized the prosecution history in which the patentee distinguished prior art that disclosed ordering search results.

<u>(2)  Analysis</u>

Claim 1 of the '204 Patent recites (emphasis added):

> 1. A computer-readable medium storing computer-executable process steps for providing resources to participants over an electronic network, said process steps comprising:
>     maintaining a collection of resources, wherein both the collection and the resources can be accessed by a participant over the electronic network at any given time;
>     assigning points to individual resources based on an amount of participant access of said individual resources over the electronic network; and
>     *modifying the collection based on the points assigned to the resources.*

As Defendants note, the claims recite a "maintaining" limitation that is separate from the "modifying" limitation in dispute. In general, "we must presume that the use of . . . different terms in the claims connotes different meanings." *CAE Screenplates, Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000); *accord Primos, Inc. v. Hunter's*

*Specialties, Inc.*, 451 F.3d 841, 848 (Fed. Cir. 2006) ("[T]he terms 'engaging' and 'sealing' are both expressly recited in the claim and therefore 'engaging' cannot mean the same thing as 'sealing'; if it did, one of the terms would be superfluous.").

As to claim differentiation, the recital in dependent Claim 2 that resources "are removed from the collection" could be read to suggest that "modifying" in Claim 1 means something more than simply adding or removing. Claim differentiation is not persuasive here, however, because the dependent claims also specify other limitations, such as that what are removed are "resources having a worst overall rating based on assigned points" in dependent Claim 2. *See Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001) ("Claim differentiation, while often argued to be controlling when it does not apply, is clearly applicable when there is a dispute over whether a limitation found in a dependent claim should be read into an independent claim, *and that limitation is the only meaningful difference between the two claims*.") (emphasis added).

The specification discloses that a collection of resources is maintained and that resources can be removed or moved:

> Thus, according to one aspect, the invention *maintains a collection of resources* that can be accessed by a participant over the electronic network (such as the Internet) at a given time and, typically upon request, provides such resources to the participant over the electronic network. Points are assigned to each resource based on participant access of the resource and *the collection is modified based on the points assigned to each resource*. For instance, a fixed number of points may be assigned to each resource when a participant accesses the resource and the *resources having the worst overall rating based on assigned points may be removed from the collection. Alternatively, a resource may be moved from the initial collection and placed in a second collection* when its number of points has reached a certain predetermined criterion (e.g., a fixed number or a fixed number within a set period of time).
>
> By assigning points and modifying the collection in the foregoing manner, the present invention can provide a systematic and automatic technique for *updating a collection of resources* over an electronic network, such as the Internet.

* * *

In a further aspect, the invention is directed to providing information to participants over an electronic network by maintaining a collection of resources. Participants are permitted to rate the resources and points are assigned to each resource based on participant rating of the resource. The *collection of resources is then modified* based on assigned points for each resource.

In the foregoing manner, participants have the ability to directly assess the usefulness of any particular resource to them and *these assessments are utilized to modify the collection*. This can have the effect of making the resource collection even more responsive to the needs of the participants (or users) because, although a resource might initially appear to be valuable, upon closer inspection a user might find it to be inaccurate, poorly organized or lacking for any other reason. Thus, allowing participant ratings and the utilization of those ratings in the foregoing manner often will account for such problems.

'204 Patent at 10:8-60 (emphasis added).

Although Plaintiff argues that "[t]his discussion clearly indicates that removing resources from the collection is merely one of many possible instances of modifying a collection" (Dkt. No. 113 at 14), the specification does not disclose any examples of "modifying" that do not involve adding or removing. *See Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011) ("In reviewing the intrinsic record to construe the claims, we strive to capture the scope of the actual invention, rather than strictly limit the scope of claims to disclosed embodiments or allow the claim language to become divorced from what the specification conveys is the invention."); *see also Nystrom v. TREX Co., Inc.*, 424 F.3d 1136, 1144-45 (Fed. Cir. 2005) (construing term "board" to mean "wood cut from a log" in light of the patentee's consistent usage of the term; noting that patentee "is not entitled to a claim construction divorced from the context of the written description and prosecution history").

Moreover, during prosecution of the '204 Patent, the patentee stated:

The present invention generally concerns systems, apparatuses, methods and techniques for *managing and modifying* a collection of resources that is accessible

> over an electronic network. It is applicable, e.g., to management of a collection of content based on the perceived relevance of individual items of such content to the collection's end users.

(Dkt. No. 113, Ex. D., 12/6/2010 Applicant's Pre-Appeal Conference Remarks at 1.) This statement suggests that "managing" is something distinct from "modifying." In the same prosecution history document, the patentee also distinguished the "Perkins" reference, United States Patent No. 7,072,888, arguing:

> It appears that the only difference between Perkins's search engine and other conventional search engines is *Perkins's use of explicit user ratings of resources* that are returned in response to queries *in order to refine the order in which future search results are presented* to users submitting the same queries (in an attempt to list the most relevant resources first).
>
> * * *
>
> *Perkins does not appear to say anything at all about maintenance or modification of any collection of resources*, as presently recited. Rather, Perkins' system seems to be solely concerned with the problem of searching content that has been provided by others in response to specific queries, and, more specifically, providing the search results *in an order* that is more likely to reflect relevancy to the particular individual who has submitted the query. *There is simply no indication that Perkins either maintains or modifies the collection of resources that is being searched by its system.* It clearly does not say anything at all about modifying the collection of resources based on an amount of participant access of the individual resources, as presently recited.

*Id.* at 1 & 3-4 (emphasis added). Moreover, earlier in prosecution, the patentees explained that modifying search results for a search query is not "modifying the collection of resources." Dkt. No. 116, Ex. B, 11/13/2009 Amendment/Response to Office Action at 11 ("Although each [of the cited prior art references] might modify the search results that are returned in response to a given query, they do not modify the collection of resources itself.").

The patentee thus definitively explained that ordering search results is distinct from modifying a collection of resources. *Omega Eng. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003) ("As a basic principle of claim interpretation, prosecution disclaimer promotes the

public notice function of the intrinsic evidence and protects the public's reliance on *definitive* statements made during prosecution.") (emphasis added).   These statements should be given effect during claim construction.  *Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1381 (Fed. Cir. 2011) ("The patentee is bound by representations made and actions that were taken in order to obtain the patent."); *see generally Computer Docking Station Corp. v. Dell Inc.*, 519 F.3d 1366, 1374-75 (Fed. Cir. 2008).

Finally, as to extrinsic evidence, Plaintiff cites definitions of "modify" as meaning: "to change in form or character; alter"; and "to make minor changes in."  Dkt. No. 113, Ex. E, *The American Heritage Dictionary of the English Language* 1130 (4th ed. 2000); *id.*, Ex. F, *Merriam-Webster's Collegiate Dictionary* 748 (10th ed. 1998).  On balance, these extrinsic dictionary definitions should be given less weight than the consistent disclosures in the specification, coupled with the patentee's statements during prosecution.  *See Phillips*, 415 F.3d at 1322 ("[A] general-usage dictionary cannot overcome art-specific evidence of the meaning of a claim term. . . . A claim should not rise or fall based upon the preferences of a particular dictionary editor, or the court's independent decision, uninformed by the specification, to rely on one dictionary rather than another.") (citation and internal quotation marks omitted).

In sum, the specification and the prosecution history demonstrate that the disputed term refers not merely to any change but rather to adding or removing a resource.

The Court accordingly hereby construes **"modifying the collection based on the points"** to mean **"adding a resource to the collection, or removing a resource from the collection, based on the points for that resource."**

**B. "based on an amount of participant access of said individual resources" (Claim 1)**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| No construction necessary | "based upon the number of times a user views the resource itself" |

JCCC at 2.  The Court provided the parties with the following preliminary construction: "The Court finds that the term has its plain and ordinary meaning, which is not limited to being 'based upon the number of times a user views the resource itself.'"

<u>(1)  The Parties' Positions</u>

Plaintiff argues that "[t]he key term '*access*' . . . is readily understood even by a layperson that accesses a website over the Internet."  Dkt. No. 113 at 7.  Plaintiff also argues that "amount of participant access" could refer to ratings and need not take the form of a "number of times a user views the resource."  *Id.*  Finally, Plaintiff submits that the word "view" is not used in the patent-in-suit and would be vague and ambiguous.  *Id.* at 10.

Defendants respond that "[t]he specification unambiguously treats accessing and rating as two separate and distinct activities in which a user can engage."  Dkt. No. 116 at 7.  As to their proposal of "view," Defendants submit that "[w]hen the Patent[]-in-Suit discuss[es] 'access,' [it] do[es] so in the context of explaining how website users browse online materials made available through those websites."  *Id.* at 8.  Finally, Defendants urge that "based on" access should be read in light of the disclosure that software logs the *number of times* a user accesses a resource, assigns points based upon this access, and modifies the collection of resources based on the points.  *Id.* (citing '204 Patent at 39:17-23).

Plaintiff replies that "resources may be accessed by any one of retrieving, downloading (not necessarily viewing), examining, etc."  Dkt. No. 118 at 5.  Plaintiff also submits that although "the term 'based on an amount of participant access of said individual resource' should

clearly account for the incremental nature of participant access," "[a]n invention could just as easily determine the number of times a participant retrieves or downloads a resource as the number of times a participant views a resource." *Id.* at 6.

At the June 27, 2013 hearing, the parties agreed that, in the claims at issue, the references to points assigned based on "access" do *not* refer to points assigned based on user rating activity. As to whether "access" refers to "viewing," Defendants urged that all of the examples in the specification are of accessing resources through a website, by way of a display that is viewed by a user. Defendants explained that downloading, by contrast, is performed by software passively rather than by active user action. Defendants also expressed concern that Plaintiff's claim interpretation might encompass accessing "metadata" associated with a resource, without directly accessing the resource itself. Plaintiff replied that any metadata about a resource is not part of the resource itself and that, as a result, accessing metadata about a resource does not constitute accessing the resource.

(2) Analysis

Although Plaintiff argues that the disputed term should not be construed, the briefing demonstrates that the parties have a "fundamental dispute regarding the scope of a claim term," and the Court has a duty to resolve the dispute. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362-63 (Fed. Cir. 2008).

Claim 1 of the '204 Patent recites (emphasis added):

1. A computer-readable medium storing computer-executable process steps for providing resources to participants over an electronic network, said process steps comprising:
    maintaining a collection of resources, wherein both the collection and the resources can be accessed by a participant over the electronic network at any given time;
    assigning points to individual resources *based on an amount of participant access of said individual resources* over the electronic network; and

modifying the collection based on the points assigned to the resources.

The parties have agreed that the term "resource" means "website contents available to a user." JCCC at 1. The specification discloses that website contents can be assigned points when accessed:

> Each item [(resource)] may be assigned a fixed number of points, such as 1, either each time it is accessed, each time it is accessed by a unique individual, each time it is accessed by a unique individual over a given period of time (e.g., a maximum of 1 point per unique user per day), or using any other system that assigns a predetermined number of points based on access alone.

'204 Patent at 39:17-23; *id.* at 37:21-24 ("all items in the Archives have a rating (point value) derived from cumulative accesses").

The specification also discloses "Soapboxes," which are areas in which user-generated content can be accessed and assigned points:

> The following are the preferred rules for the Soapboxes: . . . (2) each Soapbox item accessed by a unique individual receives a point bump; (3) accessed Soapbox items can also be rated, with a neutral rating equivalent to no rating (the item receives only the default point bump), positive ratings worth positive (or more) points, and negative ratings worth negative (or less) points; (4) points that accrue to Soapbox items also accrue to the Soapbox owner; (5) access to archived Soapbox items also accrues (preferably lesser) points to the Soapbox owner; (6) periodically, such as every month, the lowest ranked (such as lowest 3%) of Soapboxes are "canceled" and Soapbox slots thus opened are filled from waiting candidates; . . . .

'204 Patent at 36:4-21.

As to whether "access" refers to viewing, Defendants cite the following disclosures: '204 Patent at 35:53-57 ("In order to provide access to the Soapboxes, one page of the contest website might include an overview for, and hyperlink to, each Soapbox."); *id.* at 41:47-51 ("Although the ranked and commercial Soapboxes might be available to the general public without first accessing the contest website, it is preferable to restrict the availability of at least some of the Soapboxes so that they are accessible only through the contest website."); *id.* at 21:10-13

(explaining how participants may browse a contest website and thereby "access the Soapbox of the Week" and "access all costless" website features); *id.* at 58:61-65 ("Internet server 260 . . . interact[s] with participant terminals, such as terminals 231 and 232, over the Internet in order to supply the participants with various informational resources . . . ."); and *id.* at 58:47-48 (the "terminals" are "either an ordinary computer workstation, a laptop computer, or special-purpose computing equipment").   However, Defendants do not point to any disclosure in the specification explaining how the website can determine that a page has been actually viewed by the user, as opposed to merely downloaded by the user's web browser for later viewing.  Although these disclosures provide context, none of them provides an explicit disclaimer or definition.

Defendants also argued at the June 27, 2013 hearing that "access" cannot refer to downloading because downloading is a passive software action, which might even occur without the user's knowledge, as opposed to an active user action that reflects the user's "desires":

> Accordingly, the present inventors have discovered that what is needed is a more systematic technique for providing appropriate resources to users over an electronic network, such as the Internet, that more accurately *reflects the users' desires*.

'204 Patent at 3:15-19 (emphasis added).  On balance, the specification does not support drawing a distinction between "active" and "passive" user activity, and the above-quoted objective of accounting for "users' desires" should not be imported into the claims.  *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 908 (Fed. Cir. 2004) ("The fact that a patent asserts that an invention achieves several objectives does not require that each of the claims be construed as limited to structures that are capable of achieving all of the objectives.").  Thus, Defendants have failed to establish that "access" must refer to "views."

Likewise, as to Defendants' proposal of "number of times," Defendants have failed to demonstrate that "amount" is necessarily limited to "number" rather than to magnitude, intensity,

duration, or some other measure. On balance, Defendants' proposed construction would improperly limit the disputed term to preferred embodiments and is therefore hereby expressly rejected. *See Comark Commc'ns*, 156 F.3d at 1187.

Having expressly rejected Defendants' proposal and arguments, no further construction of the disputed term is necessary. *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy."); *see also O2 Micro*, 521 F.3d at 1362 ("[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims."); *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010) ("Unlike *O2 Micro*, where the court failed to resolve the parties' quarrel, the district court rejected Defendants' construction.").

The Court accordingly hereby construes **"based on an amount of participant access of said individual resources"** to have its **plain meaning**. By agreement of the parties at the June 27, 2013 hearing, as noted above, "an amount of participant access" does *not* refer to points assigned based on user rating activity. And as Plaintiff also acknowledged, any metadata about a resource is not part of the resource itself, so accessing only the metadata associated with a resource does not constitute accessing the resource.

**C. "can be accessed by a participant over the electronic network" (Claims 1 and 20)**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary | "can be viewed by a user of a website over an electronic network" |

JCCC at 2.  The Court provided the parties with the following preliminary construction: "The Court finds that the term has its plain and ordinary meaning, which is not limited to 'can be viewed by a user of a website over an electronic network.'"

Both sides present the same arguments for this term as for the term "based on an amount of participant access of said individual resource," discussed above.  *See* Dkt. No. 113 at 10-11; Dkt. No. 116 at 9-10.  Defendants also urge that "Figures 1-4 depict the type of information that a website provides to, and receives from, a user, underscoring that a website must be *viewable* by the user for the content to be of any use."  Dkt. No. 116 at 10.

For the same reasons discussed above regarding the related term, the Court hereby expressly rejects Defendants' proposed construction and finds that no further construction is necessary.  *See U.S. Surgical*, 103 F.3d at 1568; *see also O2 Micro*, 521 F.3d at 1362; *Finjan*, 626 F.3d at 1207.

The Court therefore hereby construes **"can be accessed by a participant over the electronic network"** to have its **plain meaning**.

**D. "individual resources are accessed via the collection" (Claim 9)**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary | "an individual resource itself is viewed by clicking on a link in a collection" |

JCCC at 2.  The Court provided the parties with the following preliminary construction: "The Court finds that the term has its plain and ordinary meaning, which is not limited to 'an individual resource itself is viewed by clicking on a link in a collection.'"

Plaintiff presents the same arguments for this term as for the term "based on an amount of participant access of said individual resource," discussed above. *See* Dkt. No. 113 at 11-12. Plaintiff also argues that Defendants' proposal to limit "access[]" to "clicking on a link" should be rejected because "an individual resource, according to the patent, may be accessed in other ways than merely 'clicking on a link.'" *Id.* at 12.

Defendants respond that "[t]he specification and the entire context of the Patent[]-in-Suit demonstrate that a resource is accessed, or viewed, in the collection by 'clicking on a link,'" and "the specification of the Patent[]-in-Suit provides no other technique for 'accessing the resources.'" Dkt. No. 116 at 10. Defendants also urge that "[t]he figures of the Patent[]-in-Suit also support Defendants' construction as they depict underlined text, a common way to indicate on a web page that the text represents a hyperlink to other information." *Id.* (citing Figures 1-4). Finally, Defendants note the parties' agreement that the term "resources" means "**website contents available to a user.**" *Id.* at 10-11 (emphasis Defendants'); *see* JCCC at 1.

The specification discloses "clicking on link" in the context of a preferred embodiment:

> Clicking on link 3c pulls up the Community page 9 of the websites, which is shown in FIG. 2. This page of the site includes information primarily about the interactive informational content of the website. For example, portion 10 of the page includes links to the top 10 rated Soapboxes (as described below). In addition, clicking on link 11 pulls up a web page listing all of the Soapboxes with a brief description of each. Clicking on link 12 pulls up a web page listing available interactive games related to the subject matter of the contest. Clicking on link 13 pulls up a page describing and linking to educational classes and educational materials related to the subject matter of the contest that are available.

'204 Patent at 15:43-54.

For the same reasons discussed above regarding the related term "based on an amount of participant access of said individual resource," the Court hereby expressly rejects Defendants' proposed construction. In particular, the Court expressly rejects Defendants' proposal that

"accessed" is limited to "viewed by clicking on a link." *See Comark Commc'ns*, 156 F.3d at 1187. Having expressly rejected Defendants' proposal, the Court finds that no further construction is necessary. *See U.S. Surgical*, 103 F.3d at 1568; *see also O2 Micro*, 521 F.3d at 1362; *Finjan*, 626 F.3d at 1207. Nonetheless, Defendants' proposal of the phrase "in a collection" properly acknowledges that the resources are accessed "via the collection," the plain meaning of which is that resources are accessed through the collection rather than through some other mechanism.

Having thus resolved the parties' disputes, the Court hereby construes **"individual resources are accessed via the collection"** to have its **plain meaning**.

### E.  "maintaining" (Claim 1)

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary | "storing and managing" |

JCCC at 2. The Court provided the parties with the following preliminary construction: "storing."

### (1)  The Parties' Positions

Plaintiff argues that this term is clear on its face and that Defendants' proposal conflicts with a dictionary definition of "maintenance" as "<u>all procedures</u> necessary to keep an item in, or restoring it to, a serviceable condition . . . ." Dkt. No. 113 at 12 (quoting Ex. C, *Modern Dictionary of Electronics* (7th ed. 1999)) (emphasis Plaintiff's).

Defendants respond that in Plaintiff's opening brief and in the pre-briefing Joint Claim Construction and Prehearing Statement, Plaintiff's proposed construction for the function of the "means for maintaining" term (discussed below) included "storing and managing." Dkt. No. 116 at 5 (citing Dkt. No. 113 at 20); Dkt. No. 96, Ex. B at 5.

Plaintiff replies that it "erroneously overlooked its proposed function for the term 'means for maintaining . . .'" but that "[t]he truth is, 'maintaining' is far more than merely 'storing and managing.'"  Dkt. No. 118 at 4.  Nonetheless, Plaintiff "does not disagree that 'maintaining' in the context of the claims includes at least 'storing' based on the simple fact that the resources must be stored to allow for participant access."  *Id.* at 4-5.

(2)  Analysis

Although Plaintiff argues that the disputed term should not be construed, the briefing demonstrates that the parties have a "fundamental dispute regarding the scope of a claim term," and the Court has a duty to resolve the dispute.  *O2 Micro*, 521 F.3d at 1362-63.

Claim 1 of the '204 Patent recites, in relevant part (emphasis added):

1.  A computer-readable medium storing computer-executable process steps for providing resources to participants over an electronic network, said process steps comprising:
    *maintaining* a collection of resources, wherein both the collection and the resources can be accessed by a participant over the electronic network at any given time; . . . .

Plaintiff's cited extrinsic dictionary definition suggests that "maintaining" refers to "all procedures" necessary for keeping something available for use, but extrinsic dictionary definitions should be given less weight than the disclosures in the specification, coupled with the patentee's statements during prosecution.  *See Phillips*, 415 F.3d at 1322 ("[A] general-usage dictionary cannot overcome art-specific evidence of the meaning of a claim term. . . . A claim should not rise or fall based upon the preferences of a particular dictionary editor, or the court's independent decision, uninformed by the specification, to rely on one dictionary rather than another.") (citation and internal quotation marks omitted).  Further, construing "maintaining" to encompass any "necessary" procedures would be vague and potentially overbroad.

Claim 1 recites, and the specification discloses, maintaining a collection of resources such that the resources can be accessed over an electronic network:

> Thus, according to one aspect, the invention *maintains* a collection of resources that can be accessed by a participant over the electronic network (such as the Internet) at a given time and, typically upon request, provides such resources to the participant over the electronic network.

'204 Patent at 10:8-12 (emphasis added).  During prosecution of the '204 Patent, the patentee similarly stated:

> Thus, [application] independent claims 25 and 44 are directed toward providing resources to participants over an electronic network, in which a collection of resources is *maintained* and both the collection and the resources can be accessed by a participant over the electronic network at any given time.

Dkt. No. 116, Ex. B, 11/13/2009 Amendment/Response to Office Action at 9 (emphasis added).

Also during prosecution of the '204 Patent, the patentee distinguished "maintaining" from "generat[ing] on-the-fly":

> [T]he current Office Action asserts, "'a collection of resources' would have been viewed by a skilled artisan as an index or a listing of resources as disclosed by Perkins."  At the outset, Applicants note that [the] Perkins [reference's] only mention of a "listing" of resources is the listing that is provided to the user in response to a query.  However, as discussed throughout Perkins, *this listing is not "maintained" by Perkins's system, but rather is generated on-the-fly based on then-current information*.

Dkt. No. 113, Ex. D, 12/6/2010 Pre-Appeal Conference Remarks at 3 (emphasis added).

The intrinsic evidence thus demonstrates that "maintaining" refers to facilitating access to pre-existing information, which is consistent with the "storing" component of Defendants' proposal.  As part of this "storing," some type of index or catalog is necessary to keep track of each resource and its membership in a particular collection, as demonstrated by the recitation in Claim 1 that the resources "can be accessed . . . over the electronic network at any given time."  The specification supports such a reading.  *See, e.g.,* '204 Patent at 38:59-39:9 ("Each item in the

Digital Text Library preferably is assigned a permanent file name and unique URL, and has an associated catalogue entry which may be updated.").

The concept of "storing" thus includes both storing the resource itself and storing an associated catalog entry.  Defendants' proposal of "managing," however, is vague and lacks support in the patent-in-suit.  The Court therefore adopts Defendants' proposal of "storing" but hereby expressly rejects Defendants' proposal of "managing."

The Court accordingly hereby construes **"maintaining"** to mean **"storing."**

**F.  "means for modifying the collection based on the points assigned to the resources" (Claim 20)**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| Function:<br>   "changing the group of website contents based on associated point values"<br><br>Structure:<br>   The user interface or database and "middleware" application as illustrated in various embodiments. | Function:<br>   "modifying the collection based on the points assigned to the resources"<br><br>Structure:<br>   A general purpose processor executing an undisclosed algorithm.  The corresponding structure is **indefinite** as it is not adequately described in the specification. |

JCCC at 3 (emphasis added).  The parties agree that this is a means-plus-function term governed by 35 U.S.C. § 112, ¶ 6.  The Court provided the parties with the following preliminary construction:

Function: "modifying the collection based on the points assigned to the resources"

Structure: "computer system 350 programmed to assign a fixed number of points to each resource when a participant accesses the resource and (1) the resources having the worst overall rating based on assigned points may be removed from the collection or (2) a resource may be moved from the initial collection and placed in a second collection when its number of points has reached a certain predetermined criterion (such as a fixed number or a fixed number within a set period of time); and equivalents thereof"

(1)  The Parties' Positions

Plaintiff argues that the specification provides multiple examples of points being used to modify a collection, such as where low user ratings can cause something to be removed from a collection. Dkt. No. 113 at 25-26.

Defendants respond, as to the function, that "[t]here is simply no reason to vary the claim language of the function for this term beyond the original wording." Dkt. No. 116 at 21-22. Defendants also argue that the corresponding structure is the general purpose computer illustrated in Figure 13, as to which no algorithm is disclosed for performing the claimed function. *Id.* at 22.

Plaintiff replies that the specification does not require that the claimed method be implemented with a general purpose computer and, to the contrary, "a general purpose processor cannot implement the asserted claims because the inventions must run in a networked environment with multiple computer systems." Dkt. No. 118 at 11.

At the June 27, 2013 hearing, Plaintiff argued that the algorithms identified in the Court's preliminary construction are too narrow because a resource in an initial collection could be added to a second collection *without* being removed from the initial collection. In other words, Plaintiff argued that a resource can reside in more than one collection concurrently. Defendants responded that Plaintiff's argument was merely hypothetical and lacked any support in the specification. As to the Court's preliminary construction, Defendants proposed that the phrase "is capable of" be inserted before "(1)" to make clear that the software must actually be programmed to be capable of carrying out the algorithms.

(2)  Analysis

As a threshold matter, Plaintiff has not sufficiently justified modifying the claimed function.  Plaintiff's proposed function is therefore hereby expressly rejected.

The parties dispute whether the specification discloses corresponding structure for performing the claimed function.  General legal principles regarding indefiniteness are discussed in the "Applicable Law" section, above.

Title 35 U.S.C. § 112, ¶ 6 allows a patentee to express a claim limitation as "a means or step for performing a specified function without the recital of structure, material, or acts in support thereof."  *See Inventio AG v. Thyssenkrupp Elevator Ams.*, 649 F.3d 1350, 1355-56 (Fed. Cir. 2011).  The Court of Appeals for the Federal Circuit has further clarified what such functional claiming requires:

> Thus, in return for generic claiming ability, the applicant must indicate in the specification what structure constitutes the means.  If the specification is not clear as to the structure that the patentee intends to correspond to the claimed function, then the patentee has not paid the price but is rather attempting to claim in functional terms unbounded by any reference to structure in the specification.  Thus, if an applicant fails to set forth an adequate disclosure, the applicant has in effect failed to particularly point out and distinctly claim the invention as required by the second paragraph of § 112.

*Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 948 (Fed. Cir. 2007) (citations and internal quotation marks omitted).

"If there is no structure in the specification corresponding to the means-plus-function limitation in the claims, the claim will be found invalid as indefinite."  *Id.* at 950; *accord Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1363-65 (Fed. Cir. 2012); *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1338 (Fed. Cir. 2008).  Further, "the written description must clearly link or associate structure to the claimed function."  *Telcordia Techs., Inc. v. Cisco Sys., Inc.*, 612 F.3d 1365, 1376 (Fed. Cir. 2010).

Claim 20 of the '204 Patent recites (emphasis added):

- 27 -

20.  A system for providing resources to participants over an electronic network, said system comprising:

means for maintaining a collection of resources, wherein both the collection and the resources can be accessed by a participant over the electronic network at any given time;

means for assigning points to individual resources based on an amount of participant access of said individual resources over the electronic network; and

*means for modifying the collection based on the points assigned to the resources.*

Plaintiff emphasizes Figures 2, 12, and 13 as disclosure of corresponding structure for the

disputed term.  Figure 2 is reproduced here:



**FIG. 2**

Figure 2 depicts a webpage with a collection of links to "soapbox" resources and text describing that "[y]our ratings determine whether they get to keep their soapbox." Although this

text implies that modifications will be made based on user ratings, neither Figure 2 nor the accompanying description explains what structure would perform such modifications. *See* '204 Patent at 15:43-56.

Figure 12 illustrates various network components, and the specification also discloses that "the general purpose computer system illustrated in FIG. 13 might be used to implement any of processing stations 271 to 273, Internet server 260 or participant terminals 231 and 232." '204 Patent at 58:10-12. Figures 12 and 13 are reproduced here:



**FIG. 12**



**FIG. 13**

These disclosures in Figures 12 and 13 are generic, disclosing little more than general purpose computers. "[T]he written description must clearly link or associate structure to the claimed function." *Telcordia*, 612 F.3d at 1376. No such linkage is evident in the figures themselves or in the description of Figures 12 and 13. *See* '204 Patent at 57:21-59:42. Figures 12 and 13 therefore do not provide corresponding structure beyond mere general purpose computers.

"[A] means-plus-function claim element for which the only disclosed structure is a general purpose computer is invalid if the specification fails to disclose an algorithm for performing the claimed function." *Net MoneyIN Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1367 (Fed. Cir. 2008); *see WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999) ("In a means-plus-function claim in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general

purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm."). The remaining issue, then, is whether the specification discloses an algorithm for use with the general purpose computers that is sufficient for carrying out the claimed function.

Plaintiff relies upon disclosure of "numerous other embodi[m]e[nt]s to modify the collection based on points assigned to the resource." Dkt. No. 113 at 25-26 (citing '204 Patent at 10:8-24, 36:4-39 & 37:14-39). These passages disclose:

> Thus, according to one aspect, the invention maintains a collection of resources that can be accessed by a participant over the electronic network (such as the Internet) at a given time and, typically upon request, provides such resources to the participant over the electronic network. Points are assigned to each resource based on participant access of the resource and the collection is modified based on the points assigned to each resource. For instance, a fixed number of points may be assigned to each resource when a participant accesses the resource and *the resources having the worst overall rating based on assigned points may be removed from the collection.* Alternatively, *a resource may be moved from the initial collection and placed in a second collection when its number of points has reached a certain predetermined criterion* (e.g., a fixed number or a fixed number within a set period of time).
>
> * * *
>
> The following are the preferred rules for the Soapboxes: (1) candidates wishing to sponsor a Soapbox must submit the proposed Soapbox title, a 100 word description of the Soapbox, the Soapbox type (e.g., one of commentary, moderated discussion, or narrated resource collection), three writing samples (each of 500 words or more), and three personal references; and (2) each Soapbox item accessed by a unique individual receives a point bump; (3) accessed Soapbox items can also be rated, with a neutral rating equivalent to no rating (the item receives only the default point bump), positive ratings worth positive (or more) points, and negative ratings worth negative (or less) points; (4) points that accrue to Soapbox items also accrue to the Soapbox owner; (5) access to archived Soapbox items also accrues (preferably lesser) points to the Soapbox owner; (6) periodically, such as every month, the lowest ranked (such as lowest 3%) of Soapboxes are "canceled" and Soapbox slots thus opened are filled from waiting candidates; (7) stipends are paid (based on the prior rating period) to Soapbox owners based on their ratings; (8) ratings are delivered weekly to Soapbox owners; (9) the highest rated (such as the "Top 10" and "Top 40") Soapboxes are highlighted, such as by including an appropriate logo indicating that status, and the highest rated Soapboxes (such as the "Top 10") are announced via press release every rating period; (10) Soapbox candidates must have contributed

forecasts for at least three months prior to submitting their "application" and must continue to submit forecasts on a prescribed basis as a condition of maintaining their Soapboxes; (11) there exists an Acceptable Use Policy; (12) there exists an Oversight Board (preferably composed of contest staff members, Soapbox Proprietors, representatives from the user community, and outside representatives) charged with enforcing the Acceptable Use Policy—the Oversight Board can discipline and/or remove Soapbox owners, but such actions must be published within the Soapbox area; and (13) the foregoing rules are posted in the Soapbox area.

* * *

The following are the preferred rules in connection with the Archives: (1) Soapbox contents are automatically archived; (2) feature stories and other material generated by the editorial staff of the contest are automatically archived; (3) Soapbox owners can sponsor items to be added to the Archives; (4) there is a special area of the Archives called the Dumpster—anyone can add material to the Dumpster; (5) all items in the Archives have a rating (point value) derived from cumulative accesses; (6) each item accessed by a unique individual receives a point bump; (7) accessed items can also be rated, with a neutral rating equivalent to no rating (the item receives only the default point bump), positive ratings worth more points, and negative ratings worth negative points; (8) standard searches exclude the Dumpster and return items are sorted first by keyword match, then by rating and/or access points; (9) Dumpster searches search only the Dumpster but return items sorted in the same way as standard searches; (10) highly rated Dumpster items (e.g., those exceeding a specified threshold score—see the discussion below) are "promoted" out of the Dumpster to the Archives proper; (11) there is a "top 40" area of the Archives, consisting of the forty highest rated items and the forty highest rated authors within the last week, the last month, and cumulatively; (12) items not meeting the Acceptable Use Policy are deleted; and (12) [*sic*, (13)] the Archive rules are posted in the Archives.

'204 Patent at 10:8-24, 36:4-39 & 37:14-39.

On balance, suitable algorithms are disclosed at column 10, lines 8-24 of the '204 Patent, quoted above, including that: (1) "the resources having the worst overall rating based on assigned points may be removed from the collection"; and (2) "a resource may be moved from the initial collection and placed in a second collection when its number of points has reached a certain predetermined criterion (e.g., a fixed number or a fixed number within a set period of time)."

At the June 27, 2013 hearing, Plaintiff urged the Court to specify an algorithm in which a resource in an initial collection can be added to a second collection *without* removing the resource from the initial collection. The specification discloses that resources can reside in both a Soapbox area and in the Archives, concurrently, as well as in both the Archives and in a "'top 40' area of the Archives":

> The following are the preferred rules for the Soap boxes: . . . (2) each *Soapbox item accessed by a unique individual receives a point bump*; (3) accessed *Soap box items can also be rated*, with a neutral rating equivalent to no rating (the item receives only the default point bump), positive ratings worth positive (or more) points, and negative ratings worth negative (or less) points; . . . .
>
> * * *
>
> When a Soapbox Proprietor approves a submission, the Soapbox Proprietor uses a Community Upload Tool to *enter the contribution into her Soapbox. After a minimum amount of time as part of published Soapbox content, the submission is automatically uploaded into the Archives.* This is the same process the Proprietor uses for uploading her own materials into the Archives. . . .
>
> The following are the preferred rules in connection with the Archives: (1) *Soapbox contents are automatically archived*; . . . (11) there is a *"top 40" area of the Archives, consisting of the forty highest rated items* and the forty highest rated authors within the last week, the last month, and cumulatively; . . . .

'204 Patent at 36:4-15, 37:3-16 & 37:34-37 (emphasis added). On balance, this disclosure adequately supports Plaintiff's additional proposed algorithm. *See Ishida Co., Ltd. v. Taylor*, 221 F.3d 1310, 1316 (Fed. Cir. 2000) (noting that a patent can "disclose[] alternative structures for accomplishing the claimed function").

Because the specification discloses algorithms for performing the claimed function, Defendants' request for a finding of indefiniteness is hereby denied.

The Court hereby finds that for the **"means for modifying the collection based on the points assigned to the resources,"** the function is **"modifying the collection based on the points assigned to the resources"** and the corresponding structure is **"computer system 350**

programmed to assign a fixed number of points to each resource when a participant accesses the resource and also programmed to perform some or all of the following: (1) the resources having the worst overall rating based on assigned points are removed from the collection, (2) a resource is moved from an initial collection and placed in a second collection when its number of points has reached a certain predetermined criterion (such as a fixed number or a fixed number within a set period of time), or (3) a resource in an initial collection is added to a second collection when its number of points has reached a certain predetermined criterion (such as a fixed number or a fixed number within a set period of time); and equivalents thereof."

### G.  "means for maintaining a collection of resources" (Claim 20)

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Function:<br>    "maintaining a group of website contents"[1]<br><br>Structure:<br>    The user interface or database and "middleware" application as illustrated in various embodiments | Function:<br>    "storing and managing a group of website contents"<br><br>Structure:<br>    A general purpose processor executing an undisclosed algorithm.  The corresponding structure is **indefinite** as it is not adequately described in the specification. |

JCCC at 3 (emphasis added).  The parties agree that this is a means-plus-function term governed by 35 U.S.C. § 112, ¶ 6.  The Court provided the parties with the following preliminary construction: "Function: 'storing a collection of resources'" and "Structure: 'computer system 350; and equivalents thereof.'"

---

[1] Plaintiff previously proposed, as the function for this term: "storing and managing a group of website contents."  Dkt. No. 113 at 20.  In its reply brief, Plaintiff states that its previous proposal was an error.  Dkt. No. 118 at 8.

(1)  The Parties' Positions

Plaintiff argues that this term does not render the claims indefinite because "the specification discloses various interfaces that display and manage different collections of resources."  Dkt. No. 113 at 21.  Plaintiff also argues that "[t]he specification describes the various general purpose or special purpose computer systems that could be used to run the invented system, but never directs the means plus function terms to a general purpose processor." *Id.* at 23.

Defendants respond that the patent-in-suit illustrates a general purpose computer in Figure 13 but "lack[s] any corresponding algorithms for 'storing and managing' the website contents."  Dkt. No. 116 at 19.  As to the "user interface" disclosures relied upon by Plaintiff, Defendants respond that a structure that provides access to a website is insufficient to constitute corresponding structure for storing and managing website contents.  *Id.* at 20.  As to the various other structures cited by Plaintiff, Defendants respond that those structures are taken out of context and do not pertain to the claims at issue.  *Id.*

Plaintiff replies that the patent-in-suit discloses "software systems with clearly identified software components to support the corresponding functions."  Dkt. No. 118 at 8.  Plaintiff also emphasizes that Figures 2 and 3 disclose interfaces, that "the inventions disclosed in the specification 'result in a better database of prediction data,'" and that "a 'middleware' application could be employed to 'cache all data' and 'then communicate between the client and server via a proprietary protocol.'"  *Id.* at 9 (citing '204 Patent at 7:8-9 & 34:27-32).

At the June 27, 2013 hearing, the parties did not address the "means for maintaining a collection of resources."

(2)  Analysis

As to the claimed function, the Court has rejected Defendants' proposal that "maintaining" means "storing and managing," as discussed above regarding the term "maintaining" in Claim 1 of the '204 Patent.  To aid clarity, the Court applies its construction of "maintaining," above, such that the recited function for the disputed term is "storing a collection of resources."

The parties' remaining dispute is whether the specification discloses corresponding structure for performing the claimed function.  "[A] means-plus-function claim element for which the only disclosed structure is a general purpose computer is invalid if the specification fails to disclose an algorithm for performing the claimed function."  *Net MoneyIN*, 545 F.3d at 1367.  The issues, then, are whether the corresponding structure is a general purpose computer and, if so, whether the specification adequately discloses an algorithm for performing the claimed function.

Plaintiff cites Figures 2 and 3.  Figure 2 is reproduced in the analysis of the "means for modifying" term, above.  Figure 3 is reproduced here:



**FIG. 3**

Figures 2 and 3 depict webpages with a collection of links to various resources.  Neither the figures nor the accompanying descriptions explain what structure will store those resources. *See* '204 Patent at 15:43-16:7.  Likewise, the other structures cited by Plaintiff are not linked to the "maintaining" function, such as the disclosures regarding improving a database:

> The present invention provides forecasting contests that include features directed to better ranking of the participants and/or that *result in a better database* of prediction data.

'204 Patent at 6:53-55 (emphasis added).

> By requiring demographic information as a condition to registration, this aspect of the invention can often *create a more useful database* of prediction data for purposes such as combination forecasting.  Also, rewarding participants for updating their predictions as early as possible can *provide a fuller, more complete and more continuous database*.  Finally, as noted above, by ranking based on track record over a pre-determined period of time, single-event strategies often can be largely eliminated.

'204 Patent at 7:33-41 (emphasis added).

> By basing the overall ranking on how soon the participants' final predictions were made before certain closing time points, as described above, this aspect of the invention often encourages earlier predictions and more frequent prediction updates, thereby providing *a more complete database* of prediction data.  At the same time, participants are rewarded for discovering and/or incorporating new information into their predictions at the earliest possible time, with the result that the both quality of the prediction data and the quality of the rankings are likely enhanced.

'204 Patent at 8:29-38 (emphasis added).

These disclosures pertain to the "forecasting contest" embodiments disclosed in the specification, which for example "range from various wagering events, such as Superbowl pools, to various financial forecasting contests."  '204 Patent at 1:21-23.  These disclosures are separate and distinct from portions of the specification that disclose maintaining a collection of resources. *Compare, e.g.,* 6:52-8:57 ("Forecasting Contest") & 15:14-24:62 (same) *with* 10:1-11:3 ("Community-Selected Content") & 35:21-42:11 (same).  Because these above-quoted

disclosures relate to improving a database of forecasts, not to storing a collection of resources, the above-quoted disclosures cited by Plaintiff are not relevant here. *See Telcordia*, 612 F.3d at 1376 (noting that "the written description must clearly link or associate structure to the claimed function").

Finally, Plaintiff relies on disclosure that "it is feasible to cache all data in a 'middleware' application and then communicate between the client and server via a proprietary protocol. This has the advantage that it does not require any database activity unless some of the data requested is not already present in the cache." As with the above-discussed "database" disclosures, the referenced "data" relates to the forecasting contest embodiments, so the "cach[ing]" cited by Plaintiff is not linked to the function of storing a collection of resources. '204 Patent at 34:24-34; *see Telcordia*, 612 F.3d at 1376.

Thus, there remains nothing for Plaintiff to rely upon other than general purpose computers, such as those illustrated in Figures 12 and 13. Although Figure 13 discloses "mass storage 368," "removable storage read/write device 369," and "removable storage media 371," none of these structures is linked to the function of storing a collection of resources. *See* '204 Patent at 58:26-29 & 58:57-59:8; *see also Telcordia*, 612 F.3d at 1376.

Generally, "[i]n a means-plus-function claim in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm." *WMS Gaming*, 184 F.3d at 1349.

There is, however, an exception to the general rule requiring an algorithm. Specifically, when the corresponding structure is a general purpose computer, an algorithm is required unless the recited function can be achieved by any general purpose computer without special

programming. *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1316 (Fed.

Cir. 2011) ("Absent a possible narrower construction of the terms 'processing,' 'receiving,' and

'storing,' . . . those functions can be achieved by any general purpose computer without special

programming.  As such, it was not necessary to disclose more structure than the general purpose

processor that performs those functions."); *accord Ergo Licensing, LLC v. CareFusion 303, Inc.*,

673 F.3d 1361, 1365 (Fed. Cir. 2012) ("In *In re Katz*, we held that '[a]bsent a possible narrower

construction' of the terms 'processing,' 'receiving,' and 'storing,' the disclosure of a general-

purpose computer was sufficient. . . . In other words, a general-purpose computer is sufficient

structure if the function of a term such as 'means for processing' requires no more than merely

'processing,' which any general-purpose computer may do without any special programming. . . .

It is only in the rare circumstances where any general-purpose computer without any special

programming can perform the function that an algorithm need not be disclosed.") (citations

omitted).

On balance, because the Court has construed "maintaining" to mean "storing," and

because "storing" was specifically identified in *In re Katz* as a simple function for which no

algorithm should be required, the *In re Katz* exception to the *WMS Gaming* rule is applicable

here.  *In re Katz*, 639 F.3d at 1316.  Various courts have applied the *In re Katz* exception in

similar circumstances.  *See, e.g., Variant Holdings LLC v. Z Resorts LLC*, No.

2:11-CV-290-JRG, 2013 WL 1949857, at *32-*33 (E.D. Tex. May 9, 2013); *e-LYNXX Corp. v.

Innerworkings, Inc.*, No. 1:10-CV-2535, 2012 WL 4484921, at *21 (M.D. Pa. Sept. 27, 2012);

*EdiSync Sys., Inc. v. Centra Software, Inc.*, No. 03-CV-1587-WYD-MEH, 2012 WL 2196047,

at *16 (D. Colo. June 15, 2012); *United Video Properties, Inc. v. Amazon.com, Inc.*, No. CIV.A.

11-003-RGA, 2012 WL 2370318, at *11 (D. Del. June 22, 2012); *Personalized Media Commc'n,*

*LLC v. Motorola, Inc.*, No. 2:08-CV-70-CE, 2011 WL 4591898, at *40 (E.D. Tex. Sept. 30, 2011).

Nonetheless, although no algorithm should be required for simply storing a resource itself, part of "storing" a resource is storing some type of index or catalog to keep track of each resource and its membership in a particular collection, as discussed above regarding the "maintaining" term.  *See, e.g.,* '204 Patent at 38:59-39:9.

The Court therefore hereby finds that for the **"means for maintaining a collection of resources,"** the function is **"storing a collection of resources"** and the corresponding structure is **"computer system 350 programmed to store the resource itself and an associated catalog entry; and equivalents thereof."**

## H.  "means for assigning points to individual resources based on an amount of participant access of said individual resources over the electronic network" (Claim 20)

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Function:<br>   "assigning a numerical value to each website contents based on user access or ratings of the contents"<br><br>Structure:<br>   The user interface or database and "middleware" application as illustrated in various embodiments. | Function:<br>   "assigning points to individual resources based on an amount of participant access of said individual resources over the electronic network"<br><br>Structure:<br>   A general purpose processor executing either of the two algorithms disclosed for assigning points: (1) assigning a fixed number of points, such as 1, (a) each time a resource is accessed; (b) each time it is accessed by a unique individual; or (c) each time it is accessed by a unique individual over a given period of time (e.g., a maximum of 1 point per unique user per day) or (2) calculating the "Intensity Budget" as given by the patent or as modified to calculate the "Intensity Weight" |

JCCC at 4-5.  The parties agree that this is a means-plus-function term governed by 35 U.S.C.

§ 112, ¶ 6.  The Court provided the parties with the following preliminary construction:

> Function: "assigning points to individual resources based on an amount of participant access of said individual resources over the electronic network"

> Structure: "computer system 350 programmed to assign a fixed number of points, such as 1, (a) each time a resource is accessed, (b) each time it is accessed by a unique individual, or (c) each time it is accessed by a unique individual over a given period of time (such as a maximum of 1 point per unique user per day); and equivalents thereof"

(1)  The Parties' Positions

Plaintiff argues that the specification discloses "numerous structures involved in assigning points to individual resources based on an amount of participant access of said individual resources over the electronic network."  Dkt. No. 113 at 24.  As to Defendants' proposal, Plaintiff counters that Defendants' "cherry-picked structures are limited to embodiments where points are only assigned based on access by a unique individual."  *Id.*  Plaintiff submits, for example, that points can be assigned based on ratings.  *Id.* at 24-25.

Defendants respond that the patent-in-suit "make[s] clear that points for access and points for ratings are two different sources for points that are assigned to a resource."  Dkt. No. 116 at 24.  Defendants urge that to adopt Plaintiff's proposal of "access *or* ratings" "would be to remove the 'points assigned based upon access' limitation altogether."  *Id.* at 25.  Finally, Defendants argue that Plaintiff's reliance on disclosure of a "user interface" and a "database and 'middleware' application" fails because the user interface is incapable of assigning points and because the disclosures cited by Plaintiff are not linked to the claimed function.  *Id.* at 26.

Plaintiff's reply brief reiterates its opening arguments.  *See* Dkt. No. 118 at 9-10.

At the June 27, 2013 hearing, Defendants proposed inserting the phrase "based on access only" after "fixed number of points" in the Court's preliminary construction.  Also, as noted

above regarding the "access" terms, the parties reached agreement that references to points assigned based on "access" do *not* refer to points assigned based on user rating activity.

(2)  Analysis

As a threshold matter, Plaintiff has not sufficiently justified modifying the claimed function.  Plaintiff's proposed function is therefore hereby expressly rejected.

Defendants are not arguing indefiniteness as to this disputed term.  The parties dispute whether the corresponding structure is a general purpose computer and, if so, what algorithm the specification discloses for performing the claimed function.

Plaintiff cites Figure 2, which is reproduced in the analysis of the "means for modifying" term, above.  Figure 2 depicts a webpage with a collection of links to "soapbox" resources and text describing that "[y]our ratings determine whether they get to keep their soapbox."  Although this disclosure of "ratings" may have some connection to the assignment of points, neither Figure 2 nor the accompanying description explains what structure performs the assigning.  *See* '204 Patent at 15:43-56.

Plaintiff also relies on disclosure that "it is feasible to cache all data in a 'middleware' application and then communicate between the client and server via a proprietary protocol.  This has the advantage that it does not require any database activity unless some of the data requested is not already present in the cache."  '204 Patent at 34:24-34.  Here, the referenced "data" relates to the forecasting contest embodiments, which are distinct from the embodiments that assign points to individual resources.  *Compare, e.g.,* 6:52-8:57 ("Forecasting Contest") & 15:14-24:62 (same) *with* 10:1-11:3 ("Community-Selected Content") & 35:21-42:11 (same).  Thus, the "cach[ing]" cited by Plaintiff is not linked to the function of assigning points.  *See Telcordia*, 612 F.3d at 1376.

On balance, the specification fails to identify anything other than a general purpose computer for performing the recited function.  The remaining task, then, is to find, if present, an algorithm in the specification for performing the recited function.  *WMS Gaming*, 184 F.3d at 1349 ("In a means-plus-function claim in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm.").

The specification discloses algorithms for assigning points each time an item is accessed, as well as for a "ratings" system:

> Each item may be assigned a fixed number of points, such as 1, either each time it is accessed, each time it is accessed by a unique individual, each time it is accessed by a unique individual over a given period of time (e.g., a maximum of 1 point per unique user per day), or using any other system that assigns a predetermined number of points based on access alone.

> It is also preferred that users are allowed to rate the utility of the resources that they access.  For example, users may be given the following options for rating resources, with the *point values* for each option indicated:

>> -2: Terrible
>> -1: Poor
>> 0: Neutral
>> +1: Good
>> +2: Excellent

> The point values may or may not be disclosed to the users. A failure to rate preferably results in a point value of 0.  Preferably, the point values from such ratings are added to the point values from access alone, although it is also possible to assign points for access only or for ratings only.  Such point values might be used directly to rank the various resources.

'204 Patent at 39:17-41.  This disclosure of assigning a point each time an item is accessed is sufficient disclosure of an algorithm.  *See Typhoon Touch*, 659 F.3d at 1386 ("Indeed, the mathematical algorithm of the programmer is not included in the specification.  However, as

precedent establishes, it suffices if the specification recites in prose the algorithm to be implemented by the programmer."); *see also Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008) (noting that "a patentee [may] express th[e] algorithm in any understandable terms including as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure") (citation omitted).

The additional disclosure of a ratings system, however, is not necessary to perform the recited function of assigning points based on *access*, so that disclosure should not be included in the Court's construction. *See Northrop Grumman Corp. v. Intel Corp.*, 325 F.3d 1346, 1352 (Fed. Cir. 2003) ("A court may not import into the claim features that are unnecessary to perform the claimed function. Features that do not perform the recited function do not constitute corresponding structure and thus do not serve as claim limitations.") (citations omitted); *see also Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1334-35 (Fed. Cir. 2004) (finding certain "structures . . . superfluous to our claim construction analysis because they are not required for performing the claimed function"); *Acromed Corp. v. Sofamor Danek Group Inc.*, 253 F.3d 1371, 1382 (Fed. Cir. 2001) (regarding a screw as corresponding structure, finding that "[t]o limit the body portion to a diameter at least as large as the crest diameter of the second externally threaded portion would be to impermissibly import into the claim limitation specific dimensions of a preferred embodiment that are unnecessary to perform the claimed function . . .").

Finally, the "Intensity Budget" disclosure cited by Defendants adjusts *how* points are assigned but is not necessary for performing the function of assigning points. *See Northrop Grumman*, 325 F.3d at 1352.

The Court therefore hereby finds that for the term **"means for assigning points to individual resources based on an amount of participant access of said individual resources**

over the electronic network," the function is **"assigning points to individual resources based on an amount of participant access of said individual resources over the electronic network"** and the corresponding structure is **"computer system 350 programmed to assign a fixed number of points, such as 1, (a) each time a resource is accessed, (b) each time it is accessed by a unique individual, or (c) each time it is accessed by a unique individual over a given period of time (such as a maximum of 1 point per unique user per day); and equivalents thereof."**

As noted above regarding the "access" terms, the parties agreed at the June 27, 2013 hearing that the references to points assigned based on "access" do *not* refer to points assigned based on user rating activity.

## CONCLUSION

The Court adopts the above constructions.  The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury.  Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury.  Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

**SIGNED this 3rd day of July, 2013.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE